FILED BY ⟋⟋⟍⟍ D.C.

**AUG 25 2020**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA, *ex rel*. Michael Zhang )

            Plaintiff, )

vs. )

NOVA SOUTHEASTERN UNIVERSITY, INC. )

            Defendant. )

                              /

**CASE NO.:**    20cv61735 WPD

**FILED UNDER SEAL**
**PURSUANT TO 31 USC §3730(B)(2)**

## COMPLAINT

Plaintiff and Relator, Michael Zhang ("Relator") brings this civil action to recover damages and civil penalties on behalf of the United States of America and against Nova Southeastern University, Inc. ("Defendant" or "NSU") arising from the false statements and false claims made and presented, and caused to be made and presented, by the Defendant in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended (the "Act") and in support states:

### INTRODUCTION

1.    This is an action to recover money disbursed by the United States Government under Title IV of the Higher Education Act (HEA) to provide financial assistance to students enrolled in Nova Southeastern University's College of Dental Medicine program, which was fraudulently demanded and received by Defendant in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. As detailed herein, Defendant received millions of dollars in Title IV funds to pay for clinical courses where the instructors did not meet legally imposed requirements. Despite knowing the instructors were unlicensed and ineligible to teach such clinical courses involving the practice of dentistry on patients, Defendant falsely certified to the Government that it was in compliance with applicable statutes and regulations in order to receive financial aid funds.

Through its material false statements and fraudulent course of conduct, Defendant knowingly caused the Government to pay Title IV funds that NSU was not legally entitled to receive.

## PARTIES, JURISDICTION, AND VENUE

2.      Relator, Michael Zhang, was at all times material a resident of Florida and a United States citizen.   In the Fall of 2014, he began his graduate studies at the Nova Southeastern University College of Dental Medicine ("NSUCDM") at its campus in Davie, Florida.  He attended NSUCDM through May 2018 when he received his degree as a Doctor of Dental Medicine ("DMD").  Relator has direct and personal knowledge to support the facts and claims as detailed herein.

3.      As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has also provided to the Government a statement of substantially all material evidence and information related to this complaint currently in Relator's possession.   This disclosure statement supports the existence of the submission of knowingly false or fraudulent claims for payment, as well as the knowing, making, using, and causing to be made and used, false records or statements material to a false or fraudulent claim under the False Claims Act, in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

4.      Defendant Nova Southeastern University, Inc. ("NSU") is a Florida corporation with its principal place of business and main campus located at 3301 College Avenue, Fort Lauderdale, Florida 33314.   Among others, Defendant owns and operates the College of Dental Medicine as referenced herein.

5.      This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

1331 and 1345 and 31 U.S.C. § 3732, the latter of which specifically confers original jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730. This Court has personal jurisdiction over the Defendant because the Defendant can be found in and transacts the business that is the subject matter of this action in the Southern District of Florida.

6.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because Defendant maintains and operates its primary campus within this district, and many of the acts that form the basis of this action occurred in the Southern District of Florida.

7.     This case is not based on a "public disclosure", but rather is based on the knowledge of Relator Michael Zhang, an "original source", as those terms are defined in 31 U.S.C. § 3730.

8.     This Complaint has been filed under seal pursuant to 31 U.S.C. § 3730 and shall remain under seal for at least sixty days and until the Court orders otherwise.

9.     A copy of this Complaint is being served on the United States Attorney General and the United States Attorney for the Southern District of Florida.

10.     Any and all conditions precedent, including as required by 31 U.S.C. § 3730, have occurred and been satisfied.

## FACTUAL BACKGROUND

11.     Pursuant to Title IV of the Higher Education Act of 1965 ("Title IV"), 20 U.S.C. §§ 1070 et seq., the Department of Education ("DOE") provides financial assistance in the form of grants, loans, and interest subsidies to help defray the costs of education for eligible students enrolled in qualifying institutions.  To be eligible to participate in Title IV funding, an institution must enter into a Program Participation Agreement ("PPA") with the DOE.  Under the PPA, the

institution certifies, among other things, compliance with all statutory provisions applicable to Title IV, that it will provide information pertaining to its administrative and financial responsibilities to the DOE and the State regulatory bodies, that it will use Title IV funds solely for program purposes in accordance with the program, and that it will comply with all its financial obligations, including required refunds.

12.     Participation in Title IV programs is also conditioned upon an institution being legally authorized to provide an education program in the State in which the institution is physically located and complying with all state approval and licensure requirements. 34 C.F.R. §§ 600.4 and 600.9. The DOE relies upon compliance with state licensing and regulatory agencies, along with authorized accrediting agencies, to ensure the integrity and quality of education offered by institutions participating in Title IV programs.

13.     The PPA also requires each institution to establish and maintain administrative procedures and records necessary to ensure proper and efficient use of Title IV funds, including documentation of eligibility.  Indeed, the DOE relies on NSU to assure and monitor regulatory compliance which is a material condition to continuing entitlement to receive said funds.

14.     Applicable to the time period at issue in this case, Defendant and DOE entered into two successive PPAs:  the PPA executed by the Secretary of DOE on March 5, 2013 (with an expiration date of December 31, 2017) and the PPA executed by the Secretary of DOE on August 16, 2018 (with an expiration date of March 31, 2024).  All of the financial assistance programs under Title IV at issue whose funds were paid to NSUCDM students were subject to the terms and conditions of these PPAs and the applicable statutes and regulations, including funds pursuant to the Federal Direct Student Loans Program, 20 U.S.C. §§ 1087a *et seq.;* 34 C.F.R. Part 685 and

Direct Plus Loans, 20 U.S.C. §§ 1078-2 *et seq.*  Funds provided by the DOE to advance these Title IV programs are paid to and administered by eligible institutions for students enrolled in their school programs.

15.    Institutions like Defendant make claims for payment of Title IV funds like, for example, funds under the Federal Direct Student Loan program.  A student first submits a Free Application for Federal Student Aid.  Then the institution certifies that the student is enrolled in an eligible program and that loan payments will be made in accordance with applicable statutes, regulations and instructions.  Assuming the student qualifies, the institution originates the loan and draws down on the loan each semester directly from the DOE or through a servicer (via the DOE Grants Management System (G-5)).  The institution must electronically certify that the funds requested are being expended in accordance with the purpose and conditions of the agreement with the DOE.  The funds are then credited to the student's account for payment for the registered NSUCDM coursework for that semester, including the clinical courses.  Any appropriate refund is due by the institution directly to the DOE. 34 C.F.R. § 685.306.

16.    Thus, in connection with the payment of Title IV funds, the institution makes a claim for payment by virtue of its drawdown requests which thereby certify that the educational program for which the funds are sought is in compliance with applicable statutes and regulations. From August 2016 through April 2020, NSU submitted hundreds of separate drawdown requests through the G-5 system in connection with the dental students approved for financial aid.

17.    Defendant operates a four-year program for its Doctor of Dental Medicine (DMD) degree.  Since at least 2016, the annual tuition at NSUCDM exceeded $60,000, and a vast majority of its dental students were receiving federal financial assistance pursuant to Title IV programs, as

administered by the DOE.  Since 2016, Defendant has received millions of dollars in Title IV funds from the DOE in connection with the clinical courses of its DMD program.

18.     At NSUCDM, the required curriculum for the DMD degree is comprised of lecture, laboratory work, and clinical courses. However, the last two years of the dental program are almost completely comprised of clinic-based coursework that involves the practice of dentistry on actual patients at NSUCDM's teaching clinics.   These clinical courses, which are described in NSU official course catalogs published each year, are taught by faculty clinic instructors that are responsible for direct supervision of the students while providing dental services in the NSU teaching facilities.

19.     Each year, approximately 125 students seek to graduate with their DMD degrees from NSUCDM.   In addition, there are about 100 postdoctoral students/residents seeking degrees in dental specialties, such as endodontics, oral surgery, orthodontics pediatrics, periodontics, and prosthodontics. All of these predoctoral and postdoctoral students must complete the clinic-based courses as an essential part of the curriculum for their degrees.

20.     To comply with their clinical coursework, hundreds of dental students registered and paid for the required courses each semester consisting of clinical rotations and experiential service with live patients. Many of these clinic-based courses spanned multiple semesters (totaling up to 11 credits), with faculty clinical instructors assigned to provide direct supervision in the teaching clinics and grades to the dental students for that coursework. The students were divided into teams, and NSUCDM posted weekly clinic schedules identifying the assigned faculty clinical instructors, with rotating responsibility as team leaders.

21.     During the years at issue, NSUCDM operated multiple teaching clinics which

provided comprehensive dental care and treatments to actual patients, including cleaning, fillings, crowns, extractions, implants, etc.   The main teaching clinic for students in the DMD program, also known as the pre-doctoral ("pre-doc") clinic, is located in Davie, Florida and the other satellite student clinics are located in various South Florida locations.

22.     As set forth in NSUCDM student handbooks, a predoctoral student is not a licensed dentist (per Florida Statutes, Chapter 466) and therefore, is legally and ethically not permitted to independently practice dentistry.   All clinic work by students requires the "direct supervision" of a clinical faculty member who is licensed in Florida to practice dentistry pursuant to that chapter.   Indeed, NSU expressly recognized that it is a violation of law and contrary to NSU rules for any unlicensed person to engage in the practice of health care.

23.     It is well established that the required "direct supervision," which is defined in Florida Statute §466.003(8), means "supervision whereby a *dentist* diagnoses the condition to be treated, a *dentist* authorizes the procedure to be performed, a *dentist* remains on the premises while the procedures are performed, and a *dentist* approves the work performed before dismissal of the patient."   This means that the clinical coursework by students that involved patient care must at all times be performed while under the *direct supervision* of a clinical faculty member who is licensed to practice dentistry pursuant to Florida Statute, Chapter 466. Moreover, Florida does not have reciprocity with any state and does not issue dental licenses by endorsement or credentials.

24.     The legal eligibility for an instructor to provide the mandatory *direct supervision* is based on either (a) a dental license issued to the instructor by the Florida Department of Health or (b) a teaching permit issued to a full time dental instructor who only practices dentistry at the

school's teaching facilities, also issued through the Department of Health.   Rigorous criteria and testing must be first satisfied by each faculty clinic instructor in order to be become eligible, including successfully passing the Florida Laws and Rules Examination.

25.     During the period of August 2016 to May 2018 (and believed to be continuing), NSU systematically and consistently assigned ineligible instructors (who held no Florida dental license and no Florida teaching permit) for clinic-based coursework at its teaching facilities.   A comprehensive review of historical NSUCDM clinic schedules (from 2016-2018) revealed that more than 20 faculty clinical instructors (who were assigned to supervise Relator and hundreds of other dental students enrolled in clinical courses) were not eligible to teach such courses because they lacked the mandatory state licensing.

26.     NSU repeatedly misrepresented the legal qualifications of its clinical faculty instructors assigned to its teaching clinics, while concealing the serious violations of Florida licensing requirements.   Not only did this violate material conditions of the PPAs and Title IV regulations, but it also created a significant risk to patient health and safety.

27.     In blatant violation of Florida law and institutional prohibitions, NSU assigned ineligible instructors to handle the day to day duties of supervising students involved in patient examination, diagnosis, and treatment.   In this capacity, these instructors themselves engaged in the actual practice of dentistry as dentists, including examination, diagnosis, treatment planning, and treatment -- many times directly operating with handpieces themselves. At the same time, NSUCDM charged and received Title IV funds as tuition for those instructional services based on false statements relating to its clinical instructors assigned to provide direct supervision and serve as team leaders.  For example:

(a)  J.G. served as assigned faculty clinical instructor and team leader at the Pre-doc

teaching clinic at NSU's campus between 2016 and 2018 for clinic-based courses in the DMD program that involved patient care.  During that time, J.G. was assigned to supervise the coursework for which tuition was received from hundreds of dental students (including Relator's tuition for CDM 4411, Clinical Removable Prosthodontics II), but was not licensed to practice dentistry pursuant to Florida Statute, Chapter 466 and was not eligible or legally qualified to serve as an instructor for such clinical courses.

(b) G.W. served as assigned faculty clinical instructor at the Pre-doc teaching clinic at NSU's campus between 2016 and 2018 for clinic-based courses in the DMD program that involved patient care.  During that time, G.W. was assigned to supervise the coursework for which tuition was received from hundreds of dental students (including Relator's tuition for CDM 3410, Clinical Fixed Prosthodontics I), but was not licensed to practice dentistry pursuant to Florida Statute, Chapter 466 and was not eligible or legally qualified to serve as an instructor for such clinical courses.

(c)  M.G. served as assigned faculty clinical instructor at the Pre-doc teaching clinic at NSU's campus between 2016 and 2018 for clinic-based courses in the DMD program that involved patient care.  During that time, M.G. was assigned to supervise the coursework for which tuition was received from hundreds of dental students (including Relator's tuition for CDM 4500, Clinical Restorative Dentistry II), but was not licensed to practice dentistry pursuant to Florida Statute, Chapter 466 and was not eligible or legally qualified to serve as an instructor of such clinical courses.

(d) J.N. served as assigned faculty clinical instructor at the Pre-doc teaching clinic at NSU's campus between 2016 and 2018 for clinic-based courses in the DMD program

that involved patient care. During that time, J.N. was assigned to supervise the coursework for which tuition was received from hundreds of dental students (including Relator's tuition for CDM 3621, Clinical Endodontics I), but was not licensed to practice dentistry pursuant to Florida Statute, Chapter 466 and was not eligible or legally qualified to serve as an instructor of such clinical courses.

Aside from allowing rampant unlicensed practice of dentistry detrimental to patients, NSUCDM's degree programs deprived its students of instructors that met the qualifications necessary to teach clinical courses and misrepresented the quality and nature of the instructional services.

28.     In violation of 20 U.S. Code §1094(c)(3), Defendant misrepresented the nature and quality of its educational programs, including making misstatements about (a) the qualifications, licensing, and eligibility of its faculty assigned as instructors for clinical courses; and (b) the failure to provide direct supervision for clinical coursework by dental students engaged in the practice of dentistry on actual patients.

29.     NSU's conduct, certifications, and representations were made with knowledge of noncompliance since it is directly responsible for the verification of the credentials of its clinical faculty and for requiring appropriate licensing before practicing health care in its teaching facilities. Indeed, the dean of the dental school is actually charged with assessing clinical instructor qualifications and then submitting applications for dental teaching permits upon confirming satisfaction of all prerequisites. See FAC 64B-5-7.005.

30.     Despite NSU's knowledge of, or at least reckless disregard for, the ineligibility of a large portion of its clinical faculty, NSU charged its students and received funds from the federal Government to pay tuition for such courses under Title IV of Higher Education Act. With respect to each clinical course like CDM 3410, CDM 4410, CDM 4411, and CDM 4500, NSU charged

tuition that exceeded $11,000 (11 credits @ approx. $1000 per credit hour) – all paid for by Relator's Title IV funds.   In actuality, every claim for and receipt of payment of such tuition in connection with clinical courses since at least 2016, was made under these false pretenses and constitutes a false claim in violation of the False Claims Act, as amended.

31.    Indeed, the certifications made in connection with its PPAs, and each drawdown request by Defendant since 2016 through the G-5 system constituted a false certification and false statement that is actionable as asserted herein.   Had the Government known of the false claims, false certifications and misrepresentations, it would not have disbursed Title IV funds to NSU for its clinical courses during the subject years.

32.    Defendant failed to disclose noncompliance with material requirements and as a result, made misleading and false statements with respect to the educational program and NSU's legal entitlement to payment of Title IV funds.

## RELATOR DISCOVERS NSU'S FALSE CLAIMS

33.    Having attended NSUCDM since the fall of 2014 until his graduation in May 2018, Relator registered and paid (with Title IV program funds) for numerous clinical courses in connection with the required curriculum.   Near the end of his final semester, Relator discovered that numerous clinical instructors and team leaders were not licensed dentists (nor did they hold a teaching permit).

34.    Relator became concerned about the nature and quality of NSU's educational program and the unlicensed practice of health care which impacted him and the vast majority of his classmates taking clinical courses at the same time.   This caused him to delve into historical NSU records of assigned clinic instructors, as well as computer reports of patient procedures

performed in connection with his clinical coursework at NSU teaching clinics.

35.     These records established NSU's pervasive and longstanding practice since at least the Fall of 2016 of assigning clinical faculty instructors that lacked the credentials required by law to teach the courses.  What is more, NSU knew or acted with reckless disregard, of public licensing records showing that instructors assigned to the student clinics were not legally permitted to teach such clinical courses.

36.     Relator compiled and evaluated the clinic instructor assignments, the Predoc clinic schedules, his transcripts, and tuition billing records, treatment notes, and other available records. All of this documentation confirmed the assignment of over 20 legally unqualified and ineligible instructors during the last two years of his clinical coursework in the DMD program, for which NSU charged tuition.

37.     Contrary to Florida law, program requirements, and institution policy, the clinical courses offered each semester from 2016-2018 involved ineligible and legally unqualified instructors.  All of this is documented in the student and clinic records maintained by NSU, and the following specific examples identified by Relator are illustrative:

(a)     Relator enrolled in the clinical course at NSUCDM called CDM 3410, Clinical Fixed Prosthodontics I, which is a longitudinal course spanning three semesters (summer 2016, Fall 2016, and Winter 2017) and cumulatively worth 11 credits. These credits were paid for by Title IV funds in the form of Direct Plus and Direct Unsubsidized Loans.  Per CDM 3410's official course description in the HPD (Health Professions Division) course catalog, all clinical coursework was to be accomplished under the direct supervision of appropriate faculty clinic instructors.

Despite these representations about the nature and quality of the NSUCDM program, NSU assigned instructor G.W. to supervise the coursework at the pre-doc clinic. This instructor supervised the coursework and provided an evaluation which contributed to the final grade in CDM 3410. Relator's coursework included work on patient S.B. on November 10th, 2016 (porcelain fused to metal crown on tooth #18) at the Predoc clinic. At no time during this clinical coursework did G.W. hold an active license to practice dentistry in Florida or otherwise hold a dental teaching permit.

(b)    Relator enrolled in the clinical course at NSUCDM called CDM 4411, Clinical Removable Prosthodontics II, which is a longitudinal course spanning three semesters (summer 2017, Fall 2017, and Winter 2018) and cumulatively worth 11 credits. These credits were paid for by Title IV funds in the form of Direct Plus and Direct Unsubsidized Loans. Per CDM 4411's official course description in the HPD (Health Professions Division) course catalog, all clinical coursework was to be accomplished under the direct supervision of appropriate faculty clinic instructors. Despite these representations about the nature and quality of the NSUCDM program, NSU assigned instructor J.G. to supervise the coursework at the pre-doc clinic. This instructor supervised the coursework and provided an evaluation which contributed to the final grade in CDM 4411. Relator's coursework included work on patient F.R. on June 26, 2017 (involving maxillary and mandibular immediate dentures) at the Predoc clinic. At no time during this clinical coursework did J.G. hold an active license to practice dentistry in Florida or otherwise hold a dental

teaching permit.

(c)     Relator enrolled in the clinical course at NSUCDM called CDM 4410, Clinical Fixed Prosthodontics II, which is a longitudinal course spanning three semesters (summer 2017, Fall 2017, and Winter 2018) and cumulatively worth 11 credits. These credits were paid for by Title IV funds in the form of Direct Plus and Direct Unsubsidized Loans.  Per CDM 4410's official course description in the HPD (Health Professions Division) course catalog, all clinical coursework was to be accomplished under the direct supervision of appropriate faculty clinic instructors. Despite these representations about the nature and quality of the NSUCDM program, NSU assigned instructor J.G. to supervise the coursework at the pre-doc clinic.  This instructor supervised the coursework and provided an evaluation which contributed to the final grade in CDM 4410.  Relator's coursework included work on patient S.B. on August 17th, 2017 (involving an implant supported bridge #13-15) at the Predoc clinic.  At no time during this clinical coursework did J.G. hold an active license to practice dentistry in Florida or otherwise hold a dental teaching permit.

(d)     Relator enrolled in the clinical course at NSUCDM called CDM 4500, Clinical Restorative Dentistry II, which is a longitudinal course spanning three semesters (summer 2017, Fall 2017, and Winter 2018) and cumulatively worth 11 credits. These credits were paid for by Title IV funds in the form of Direct Plus and Direct Unsubsidized Loans.  Per CDM 4500's official course description in the HPD (Health Professions Division) course catalog, all clinical coursework was to be

accomplished under the direct supervision of appropriate faculty clinic instructors. Despite these representations about the nature and quality of the NSUCDM program, NSU assigned instructor M.G. to supervise the coursework at the pre-doc clinic. This instructor supervised the coursework and provided an evaluation which contributed to the final grade in CDM 4500. Relator's coursework included work on patient S.M. on January 10th, 2018 (involving restorations on teeth #15 and #17) at the Predoc clinic. This included the instructor personally operating on patient S.M. using a high-speed handpiece. At no time during this clinical coursework did M.G. hold an active license to practice dentistry in Florida or otherwise hold a dental teaching permit.

(e)     Relator enrolled in the clinical course at NSUCDM called CDM 3621, Clinical Endodontics I, which is a longitudinal course spanning three semesters (summer 2016, Fall 2016, and Winter 2017) and cumulatively worth one credit. This credit was paid for by Title IV funds in the form of Direct Plus and Direct Unsubsidized Loans. Per CDM 3621's official course description in the HPD (Health Professions Division) course catalog, all clinical coursework was to be accomplished under the direct supervision of appropriate faculty clinic instructors. Despite these representations about the nature and quality of the NSUCDM program, NSU assigned instructor J.N. to supervise the coursework at the pre-doc clinic. This instructor supervised the coursework and provided an evaluation which contributed to the final grade in CDM 3621. Relator's coursework included work on patient L.S. on January 9th, 2017 (involving endodontic access and obturation on tooth

#20) at the Predoc clinic. This included this instructor personally operating on patient S.M. with an endodontic file. At no time during this clinical coursework did J.N. hold an active license to practice dentistry in Florida or otherwise hold a dental teaching permit.

38.     These are not isolated examples. Each day, the clinical coursework was accomplished under the direct supervision of faculty instructors and team leaders, who were legally ineligible and unqualified to do so. During Relator's clinical experiences in his third and fourth years at NSUCDM (between the summer of 2016 and the spring of 2018), at any given time there were on average four or five ineligible instructors assigned to clinical coursework at the Pre-doc clinic. Accordingly, the graduating classes of 2017, 2018, 2019, and 2020 encompassing hundreds of dental students, were impacted by unlicensed and ineligible faculty who acted as instructors for clinical courses paid for with federal funds contrary to the purposes of the Title IV programs and not in accordance with the terms thereof.

39.     Although they did not possess the minimum legal qualifications to teach clinical courses in the DMD and other graduate programs, unsuspecting students (including Relator) and the DOE paid tuition for such noncompliant courses. Although it was not entitled to the funds, NSU presented claims for payment under the Title IV programs to the DOE for the clinical coursework of Relator and other NSUCDM students assigned to those same courses who received federal financial aid.

40.     For so many of its dental students, Defendant sought and received student financial aid for tuition under Title IV programs, including the Federal Direct Student Loan Program and the Direct Plus Program, which in Relator's case exceeded $240,000, including

over 100 credit hours of clinical courses.  This was accomplished through NSU's material misrepresentations regarding the nature and quality of its instructional services, false certifications of its program compliance, and concealment of material violations of statutory, regulatory, and contractual requirements relating to their instructional services.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**False Claims**

41.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 40 of this Complaint.

42.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

43.     The False Claims Act, 31 U.S.C. § 3729(a)(l)(A), provides that "any person who knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable to the United States Government.  A "claim" is defined as "any request or demand ... for money ...  whether or not the United States has title to the money ...   presented to an officer, employee, or agent of the United States; or made to a . . . grantee, or other recipient, if the money ... is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money [requested] or will reimburse such ... grantee, or other recipient for  any portion of the money [requested]." *Id.* at (b)(2). "Knowingly" is defined as actual knowledge, or in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. *Id.* at(b)(l).

44.     A person who violates 31 U.S.C. § 3729(a)(l)(A) is liable to the federal Government for a civil penalty of up to $11,000 for each false claim, plus three times the amount of damages sustained by the federal Government, along with the costs of a civil action brought to recover such penalties and damages. *Id.* at (a)(l) & (3); 28 C.F.R. § 85.3(a).

45.     Through the acts described above and otherwise, Defendant and its agents and employees knowingly (or with reckless disregard to the truth or falsity thereof) submitted or caused to be submitted false claims to the DOE and Title IV programs for payment by the United States from at least 2016 through 2018, and is believed to continue to do so.

46.     The United States, the DOE, and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by Defendant and its agents and employees, paid and continue to pay Defendant for claims that would not be paid if the truth were known.

47.     By reason of the Defendant's false records, statements, claims, and/or omissions, the United States and the Title IV program have been damaged.

48.     Thus, Defendant violated the False Claims Act, in that it knowingly presented and caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

## COUNT II

### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### False Statements

49.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 40 of this Complaint.

50.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

51.     Through the acts described above and otherwise, Defendant and its agents and employees knowingly (or at least with reckless disregard to the truth or falsity thereof) made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States from at least 2016 through 2018, and is believed to continue to do so.

52.     The United States, DOE, and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by Defendant and its agents and employees, paid and continue to pay Defendant for claims that would not be paid if the truth were known.

53.     By reason of the Defendant's false records, statements, claims, and/or omissions, the United States and the Title IV program have been damaged.

54.     Thus, Defendant violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(B).

**<u>COUNT III</u>**

**Violation of the False Claims Act**
**31 U.S.C. §3729(a)(1)(G)**
**Failure to Repay Overpayment**

55.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 40 of this Complaint.

56.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

57.     Through the acts described above and otherwise, Defendant and its agents and

employees knowingly and improperly failed to timely repay to the DOE payments Defendant received for tuition (for instructional services in connection with clinical courses) that should not have been initially paid by the DOE under Title IV.  Defendants had a legal obligation to disclose and refund overpayments Defendant received within 60 days of Defendant becoming aware of the existence of the overpayment.  By failing to timely voluntarily disclose and repay these identified overpayments, Defendant concealed and avoided an obligation to pay or transmit money to the government in violation of the False Claims Act.

58.     By reason of the Defendant's failure to repay overpayments, the United States and the Title IV program have been damaged in the amount of millions of dollars.

59.     Thus, Defendant violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(G).

### Prayer for Relief

WHEREFORE, Plaintiff/Relator prays for judgment against Defendant as follows:

i.      That Defendant cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

ii.     That the Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

iii.    That the Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Civil False Claims Act;

iv.     That the Relator be awarded all costs and expenses of this action, including an award of attorneys' fees; and

v.      That the United States and the Relator receive all such other relief as the Court deems just and proper.

## Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury.

DATED:  August 25, 2020

**Kelley | Uustal, PLC**
500 North Federal Highway, Suite 200
Fort Lauderdale, Florida 33301
Telephone:  (954) 522-6601
Fax: (954) 522-6608
By: _____
Cristina M. Pierson, Esquire
Florida Bar No. 984345
cmp@kulaw.com
Catherine C. Darlson, Esquire
Florida Bar No. 112440
ccd@kulaw.com